

RECEIVED

FEB 1 5 2001
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

FEB 15 2001
ROBERT H. SHEMWELL, CLERK
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BILLY S. AUSTIN, *et al,* | ) | CIVIL ACTION NO. |
| PLAINTIFFS | ) | **CV01-0299 S** |
| | ) | |
| VERSUS | ) | JUDGE:    JUDGE WALTER |
| | ) | MAGISTRATE JUDGE PAYNE |
| OCEAN ENERGY, INC. | ) | |
| DEFENDANTS | ) | MAGISTRATE JUDGE: |

## COMPLAINT

NOW INTO COURT, through undersigned counsel, come Plaintiffs who represent the following:

### PARTIES

1.    Plaintiffs are the following sixty (60) individuals (collectively the "Plaintiffs"):

(a)    Billy S. Austin, a person of the full age of majority whose mailing address is P.O. Box 120, Coushatta, Louisiana 71019;

(b)    James Anderson, a person of the full age of majority whose mailing address is P.O. Box 31, Port Sulphur, Louisiana 70083;

(c)    Ken Anderson, a person of the full age of majority whose mailing address is 844 Country Road, 346 Elba, Alabama 36323;

(d)    Kim Anderson, a person of the full age of majority whose mailing address is 5169 Highway 84, Elba, Alabama 36323;

(e)    Patrick W. Ancar, a person of the full age of majority whose mailing address is P.O. Box 712, Port Sulphur, Louisiana 70083;

(f)    Douglas Ayres, a person of the full age of majority whose mailing address is P.O. Box 21, Hornbeck, Louisiana 71439;

(g)    Kevin Baudoin, a person of the full age of majority whose mailing address is 122 Longfellow, Maurice, Louisiana 70555;

(h)    Lonzie Beamon, a person of the full age of majority whose mailing address is 1929 Wilton Drive, New Orleans, Louisiana 70122;



1

(i)     William R. Bird, a person of the full age of majority whose mailing address is 23544 Rankin Johnson Road, Saucier, Mississippi 39574;

(j)     Mark Anthony Blanchard, a person of the full age of majority whose address is 400 Galveston Drive, Houma, Louisiana 70360;

(k)     Bruce Bond, a person of the full age of majority whose mailing address is Route 3, Box 2289, Andalusia, Alabama 36420;

(l)     Charles C. Bounds, a person of the full age of majority whose mailing address is 104 Reynolds Road, Picayune, Mississippi 39466;

(m)     Harry B. Bracke, a person of the full age of majority whose mailing address is 111 Porter Moore Drive, Opp, Alabama 36467;

(n)     Timothy Brent Bracke, a person of the full age of majority whose mailing address is Route 4, Box 106, Opp, Alabama 36467;

(o)     Conrad Burgess, Jr., a person of the full age of majority whose mailing address is P.O. Box 108, Clarenton, Louisiana 70523;

(p)     Dennis L. Case, a person of the full age of majority whose mailing address is1854 Weeks Ln. N.W., Brookhaven, Mississippi 39601;

(q)     Philip Coorville, a person of the full age of majority whose mailing address is 1128-B Michell Boyer Road, Breaux Bridge, Louisiana 70517;

(r)     Lennis Cormier, a person of the full age of majority whose mailing address is 5922 Tee Robe Road, Kaplan, Louisiana 70548;

(s)     Marvin S. Cumbie, a person of the full age of majority whose mailing address is Route 3, Box 2672, Andalusia, Alabama 36420;

(t)     Frank Daniels, a person of the full age of majority whose mailing address is P.O. Box 217, Elba, Alabama 36323;

(u)     William Brett Davis, a person of the full age of majority whose mailing address is1527 Highland Drive, Elba, Alabama 36323;

(v)     D.E. Dawsey, Jr., a person of the full age of majority whose mailing address is 235 Lakeview Road, Columbia, Mississippi 39429;

(w)     Youn Drury, a person of the full age of majority whose mailing address is 520 Plattsburg Road, Noxapater, Louisiana 39346;

(x)     David Edwards, a person of the full age of majority whose mailing address is 3070 Scott Lane, Semmes, Alabama 36575;

(y)     Ronald L. Flynn, a person of the full age of majority whose mailing address is 1010 Verrette Avenue, Bogalusa, Louisiana 70427;

(z)     James D. Fortenberry, Jr., a person of the full age of majority whose address is 377 Cedar Grove Road, Columbia, MS 39429;

(aa)    Ronnie L. Foster, a person of the full age of majority whose mailing address is P.O. Box 6215, D'Iberville, Mississippi 39532;

(bb)    Harold Glasswork, a person of the full age of majority whose mailing address is 706 Anderson Street, Purvis, Mississippi 39475;

(cc)    Dwight E. Hart, a person of the full age of majority whose mailing address is 4310 Salem Drive, Baton Rouge, Louisiana 70814;

(dd)    Brian Herbert, a person of the full age of majority whose mailing address is 31009 Highway 3143, Gueyden, Louisiana 70542;

(ee)    Derrell J. Higgins, a person of the full age of majority whose mailing address is 34242 Edgar Kennedy Road, Pearl River, Louisiana 70452;

(ff)    David J. Hodge, a person of the full age of majority whose mailing address is 211 Main Street, Jeanerette, Louisiana;

(gg)    Steven B. Johnson, a person of the full age of majority whose mailing address is 182 Merchant Circle, Ellisville, Mississippi 39437;

(hh)    Jerome A. Lannoo, a person of the full age of majority whose mailing address is 101 West Tampico Street, New Iberia, LA 70563;

(ii)    Brock L. LeBlanc, a person of the full age of majority whose mailing address is 11811 La. Hwy 696, Abbeville, Louisiana 70510;

(jj)    Wayne Ledbetter, a person of the full age of majority whose mailing address is P.O. Box 441, Jennings, Louisiana 70546;

(kk)    Jimmie O. McKenzie, a person of the full age of majority whose mailing address is 36011 Buck Drive, Pearl River, Louisiana 70452;

(ll)    Daniel R. McPhail, a person of the full age of majority whose mailing address is 2401 Sky Vista Drive West, Semmes, Alabama 36575;

(mm)   Raymond Mercier, a person of the full age of majority whose mailing address is 120 D Arceneaux Road, Scott, Louisiana 70583;

(nn)   Roger T. Metcalf, a person of the full age of majority whose mailing address is 1801 Kingsway Circle, Cantonment, Florida 32533;

(oo)   Ricky Nettles, a person of the full age of majority whose mailing address is 1577 E. Lincoln Road SE, Brookhaven, Mississippi 39601;

(pp)   Jackie Ray Perry, a person of the full age of majority whose mailing address is 100 Gard Circle, Lafayette, Louisiana 70507;

(qq)   Thomas E. Printup, a person of the full age of majority whose mailing address is P.O. Box 9, Tickfaw, Louisiana 70466;

(rr)   Jerry Rabalais, a person of the full age of majority whose mailing address is P.O. Box 389, Hessmer, Louisiana 71341;

(ss)   Micah Rodriguez, a person of the full age of majority whose mailing address is 110 C'est Bon Circle, Youngville, Louisiana 70592;

(tt)   Brent Romero, a person of the full age of majority whose mailing address is 308 Parkway Drive, Kaplan, Louisiana 70548;

(uu)   William David Shaw, a person of the full age of majority whose mailing address is Route 1, Box 211-F, Jaquin, Texas 75954;

(vv)   Ronnie St. Amant, Sr., a person of the full age of majority whose mailing address is 430 Dry Creek Road, Magee, Mississippi 39111;

(ww)   Donald Shelvin, a person of the full age of majority whose mailing address is 1000 Edwards Street, Abbeville, Louisiana 70510;

(xx)   Rex J. Stacey, a person of the full age of majority whose mailing address is 6895 Joyce Drive, Milton, Florida 32570-0622;

(yy)   David Stanley, a person of the full age of majority whose mailing address is 492 Oak Lane, Gulfport, Mississippi 39507;

(zz)   Ronnie Mitchell Storm, address currently unavailable.

(aaa)   Larry Suratt, a person of the full age of majority whose mailing address is 4711 Eunice Basile, Eunice, Louisiana 75035;

(bbb)   Perry Valliant, a person of the full age of majority whose mailing address is 206 Marigny Avenue, Mandeville, Louisiana 70448;

(ccc)   Kim Voisin, a person of the full age of majority whose mailing address is 2579 Hwy. 665, Montegut, Louisiana 70377;

(ddd)   Matthew Warihay, a person of the full age of majority whose mailing address is 10214 Bancroft Street, Bay Saint Louis, Mississippi 39520;

(eee)   Robert Washington, a person of the full age of majority whose mailing address is P.O. Box 682, Plaquemine, Louisiana 70764;

(fff)   Jerry Wilford, a person of the full age of majority whose mailing address is 601 W. Virginia Avenue, Opp, Alabama 36467;

(ggg)   Donald Craig Wilson, a person of the full age of majority whose mailing address is Route 4, Box 4270, Opp, Alabama 36467; and

(hhh)   Feltus F. Wirtz, a person of the full age of majority whose mailing address is 27539 Hilltop Church Road, Angie, Louisiana 70426.

2.     Made Defendant herein is Ocean Energy, Inc., a Louisiana corporation, (the "Company"), TIN 72-1210660, having its registered office at 3861 Ambassador Caffery, Suite 500, Lafayette, Louisiana 70503, who may be served through its registered agent:   Carolyn Trahan Bertand, 3861 Ambassador Caffery, Suite 500, Lafayette, Louisiana 70503.

## JURISDICTION

3.     This Court has original "federal question" subject matter jurisdiction over Counts 1, 3, 4, 5 and 6 pursuant to 28 U.S.C. Section 1331, 29 U.S.C. Section 1002, *et seq.* [the Employee Retirement Income Security Act of 1974 ("ERISA")] and, 9 U.S.C. Section 2 *et seq.* [the Federal Arbitration Act] and supplemental jurisdiction over the remaining Counts pursuant to 28 U.S.C. Section 1367.

## VENUE

4.     Venue of this action lies in this Court pursuant to 28 U.S.C. Section 1391

because a substantial number of plaintiffs reside within this judicial district and the defendant's registered office and agent are located within this judicial district and a substantial part of the events or omissions giving rise to the claims set forth below occurred within this judicial district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.     This action seeks review of the Company's decision to deny Plaintiffs severance benefits due under the 1999 Change of Control Severance Plan (the "Plan"). By its terms, the Plan required Plaintiffs to exhaust their administrative remedies prior to seeking relief from a denial of benefit entitlements due under the Plan. Plaintiffs exhausted all administrative remedies required by the Plan as they (i) timely demanded the Committee to remit their benefit entitlements due under the Plan, (ii) timely requested the Committee to review its denial of their claims and (iii) timely filed this action for relief.

## STATEMENT OF FACTS

6.     On February 8, 1999, the Company adopted the Plan which provided certain severance benefits to all "covered employees" of the Company. By its terms, the Plan provided that it could "[n]ot be amended to reduce benefits or rights to benefits within two (2) years following a Change of Control." *See,* Section 4.5 of the Plan.

7.     Pursuant to Section 2.1 of the Plan, all "covered employees" [as defined in Section 1.1(h)] are entitled to cash severance pay and other benefits in the event they experience an "Involuntary Termination" [as defined in Section 1.1(l)] occurring within two (2) years after the date upon which a "Change in Control" [as defined in Section 1.1(c)] occurs.

8.     Plaintiffs are former employees of the producing division of the Company who

6

worked in the East Bay Field, near the coast of Louisiana. All Plaintiffs were "Covered Employees" as that term is defined in Section 1.1(h) of the Plan.

9.     On or about March 31, 2000, the Company sold to Energy Partners, Limited ("EPL") all of its interest in many of the properties located within the East Bay Field by retained its interest in some of the properties located with the East Bay Field.

10.     All Plaintiffs experienced an "Involuntary Termination" (as defined in Section 1.1(l) of the Plan) as they were terminated by the Company on or about March 31, 2000.

11.     On or about date of their involuntary termination, all Plaintiffs received a "Notice of Separation Alleging Disqualification" identifying the reason for their termination by the Company as "lack of work" or "reduction in force."

12.     Prior to their last day of work for the Company, Plaintiffs received a memorandum dated February 10, 2000, from Peggy T. d'Hemecourt advising that the SPD had been revised by instrument dated January 2000, to reflect certain amendments to the Plan purportedly adopted on March 29, 1999, which changed the definition of "Involuntary Termination" to exclude any termination of employment "[o]ccurring as a result of or in connection with the sale or other divestiture by the Company of a division, subsidiary, or other business segment (including, without limitation, a divestiture by sale of shares of stock or assets) if such Covered Employee is offered continued employment by the acquirer of such business segment immediately upon such sale or divestiture..."

13.     Prior to their receipt of Ms. d'Hemecourt's February 10, 2000, memorandum, Plaintiffs had not been provided with notice of any amendments to the Plan which were purportedly made nearly a year earlier on March 29, 1999, and they did not have any actual knowledge of said amendments.

14.    Following their termination from the Company, Plaintiffs received offers of temporary employment from EPL to work in the East Bay Field.

15.    Following their involuntary termination, the Company denied severance benefits to Plaintiffs.  Notwithstanding its denial of severance benefits to Plaintiffs, the Company paid severance benefits to their co-workers who accepted employment with Brown & Root to render independent contractor services to EPL with respect to the properties located within the East Bay Field.  Thus, many of Plaintiffs' co-workers received the severance benefits under the Plan and continue to render services in the East Bay Field.

16.    By letter dated May 23, 2000, from Plaintiffs' counsel to the Administrative Committee (the "Committee") of the Plan, Plaintiffs made demand for all severance benefits due under the Plan.

17.    By letter dated August 23, 2000, from the Committee to Plaintiffs' counsel, the Committee denied all of Plaintiffs' demands.  In its letter, the Committee concluded that Plaintiffs' termination occurred as a result of the sale of a "business segment" and further concluded Plaintiffs were offered "continued employment." Accordingly, the Committee concluded Plaintiffs did not fall within the amended definition of "Involuntary Termination" and were not entitled to any severance benefits.

18.    By letter dated October 18, 2000, from Plaintiffs' counsel to the Committee, Plaintiffs requested the Committee to review its denial of their claims for benefit entitlements due under the severance plan.

19.    By letter dated December 15, 2000, from the Committee to Plaintiffs' counsel, the Committee denied all of Plaintiff's demands.

20.    Section 3.6 of the Plan provides that if a covered employee is not satisfied with

the Committee's decision, he or his representative must request by written notice that his claim be submitted to arbitration and will be forced pay one-half of all costs of arbitration.

21.     By letter dated December 19, 2000, from Plaintiffs' counsel to the Committee, Plaintiffs demanded a consolidated arbitration proceeding to review the propriety of the Committee's denial of severance benefits due under the Plan.  Plaintiffs reserved their right to file a civil action with respect to all other issues.

22.     By letter dated January 16, 2001, from the Company's counsel to the American Arbitration Association ("AAA"), the Company objected to a consolidated arbitration proceeding and demanded 60 separate arbitration proceedings (1 for each Plaintiff).

23.     By letter dated February 7, 2001, from the AAA to counsel, the AAA advised that absent the Company's consent, Plaintiffs could not consolidate their claims but rather must arbitrate their cases individually.

24.     Plaintiffs' one-half share of the total arbitral fees assessed by the AAA will likely exceed $240,000 for the 60 separate arbitration proceedings (approximately $4,000 per proceeding) and would cost at least $9,000 in filing fees ($150 per person).

25.     The arbitral cost allocation scheme effectively prevents Plaintiffs from pursuing their claims for severance benefits because it is simply cost prohibitive for Plaintiffs to pay a minimum of over $250,000 to litigate their claims.

26.     As set forth below:  (i) the mandatory arbitration provision of the Plan is unenforceable, (ii) the Amended Plan is void because it was improperly amended, (iii) assuming the amendments were properly enacted (which is denied), the Amended Plan is void because Plaintiffs did not receive proper notice of the amendments, (iv) assuming the Amended Plan was properly enacted and disclosed (which is denied), the Amended Plan does not deprive

Plaintiffs of any benefit entitlements because the Company's sale of properties located within the East Bay Field did not constitute a sale of a "business segment," and (v) assuming the Plan was validly amended and properly disclosed and the sale of the East Bay Field constituted a sale of a "division, subsidiary or other business segment" (all of which is denied), the Amended Plan does not deprive Plaintiffs of any benefits because they were not offered "continued" employment by the acquirer of the assets.

## COUNT 1
### REQUEST FOR DECLARATORY JUDGMENT
### HOLDING PLAN IS NOT SUBJECT TO ERISA

27.    The averments of Paragraphs 1 through 26 above are reiterated by reference and realleged here as though copied *in extenso*.

28.    Plaintiffs seek a declaratory judgment that the Plan is not governed by ERISA. The Plan (a copy of which is attached as Exhibit 1) is not subject to ERISA because it simply required the Company to make a one-time lump sum payment to Plaintiffs as well as continuation of certain fringe benefits triggered by a single event -- the change of control -- and did not create an on-going administrative program to process claims and pay benefits.    *See generally, Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (employee benefit package is an ERISA plan only if its "provision by nature requires an ongoing administrative program to meet the employer's obligation.  The requirement of a one time lump sum [severance] payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation" and thus is not an ERISA plan); *Young v. Washington Gas Light Co.,* 206 F.3d 1200 (D.C. Cir. 2000) (obligation to determine one time lump sum severance benefits based on single triggering event was purely mechanical and did not constitute ERISA plan); *Rodowicz v. Massachusetts Mut. Life Ins. Co.,* 192 F.3d 162

(1st Cir. 1999) (one time severance benefit offered to all employees required little in the way of administrative burden or expense and was not an ERISA "plan."); *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1316 (9th Cir. 1997) (plan offering different benefits to those terminated for cause or not for caused involved only a "minimal quantum of discretion" and was not sufficient administrative burden to turn lump sum severance agreement into ERISA plan); *Belanger v. Wyman-Gordon Co.*, 71 F.3d 451 (1st Cir. 1995) (one time lump sum severance payments based upon years of service required only mechanical decision making and did not constitute a "plan" for purposes of ERISA.); *Delaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir. 1994) (severance payments to be made over the course of up to 24 months "does not rise to level of an ongoing administrative scheme" because "there is nothing discretionary about the timing, amount or form of payment."); *James v. Fleet/Norstar Fin'l Group, Inc.*, 992 F.2d 463, 468 (2nd Cir. 1993) (lump sum severance plan requiring individual determinations regarding eligibility, termination dates and payment amount did not create ERISA plan); *Fontenot v. NL Industries, Inc.*, 953 F.2d 960 (5th Cir. 1992) (severance plan requiring company to make only a one-time lump sum payment to certain employees as well as a 3 year continuation of certain benefits triggered by a single event – the change of control – was not an ERISA plan as it did not create an on-going administrative program to process claims and pay benefits); *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1539 (3rd Cir. 1992) (obligation to make one time lump sum termination payment and to continue employee's existing benefits for one year not an ERISA plan because obligation to provide continuing benefits "did not require the creation of a new administrative scheme, and did not materially alter an existing [one]"); *Hijeck v. United Technologies, Corp.*, 24 F.Supp.2d 243 (D. Conn. 1998) (lump sum severance plan's continuation of ERISA covered benefits, such as medical,

dental and life insurance, did not transform plan itself into ERISA "plan.").

29.     Despite well established law to the contrary and without citation to any authority, the Committee concluded the Plan is "correctly defined as an 'ERISA plan' ... even if the Plan were ultimately found not to [comply with ERISA]" because, it says, the Company intended to create a plan that would be governed by ERISA.  The Committee, however, did not cite any evidence or other factual basis upon which it inferred the Company's intent.

30.     Moreover, even if the Company could prove that it intended to create an ERISA plan (which is denied), there is simply no authority to support the Committee's contention that the Plan should be governed by ERISA if it does not comply with that statute.  In fact, the Plan itself does not say that it should be governed by ERISA nor does it incorporate any of the provisions of ERISA by reference.  Even had the Plan incorporated certain provisions of ERISA (which it clearly did not), "it is well established that parties who are not subject to a statute may choose to use parts of the statute to define their relationship without brining the full force of the statute to bear." *Craddock Intern. Inc., v. W.K.P. Wilson & Son, Inc.,* 116 F.3d 1095, 1107-1108 (5th Cir. 1997).  "There can be no doubt that if they had wanted to, the drafters of this contract could have identified specific provisions or sections of [the statute] and incorporated them by individual reference.  Surely no one could then argue that by doing so all the provisions of [the statute] would apply." *Id.* citing *Ralston Purina Co. v. Barge Juneau & Gulf Caribbean. Marine Lines,* 619 F.2d 374, 375 (5th Cir. 1980).  "[W]hen [a statute] does not apply of its own force but is incorporated into a ... contract by reference, it does not have 'statute rank[.]'" *Croft & Scully Co. v. M/V Skulptor Vuchetich,* 664 F.2d 1277, 1280 (5th Cir. 1982).

31.     Instead of supplying a provision of the Plan where none exists, the Committee should have interpreted the Plan in accordance with its express terms.  According to the Plan,

the Committee must required to interpret it in accordance with applicable state law to the extent not preempted by federal law. The Committee, however, argued that ERISA (not state law) should *always* govern the interpretation of the Plan, even if it is not an ERISA plan.  The Committee's interpretation renders the Plan's choice of law provision meaningless.  Under established rules of construction, the Committee must give effect to all provisions of the contract so that none are rendered meaningless.  *Triad Elec. & Control, Inc., v. Power Systems Engineering, Inc.* 117 F.3d 180 (5th Cir. 1997) (applying Texas law); *Texas Eastern Transmissions Corp. v. Amerada Hess Corp.,* 145 F.3d 737 (5th Cir. 1998) (applying Louisiana law).

**COUNT 2**
**CLAIM FOR BENEFIT ENTITLEMENTS UNDER NON-ERISA LAW**

32.     The averments of Paragraphs 1 through 31 above are reiterated by reference and realleged here as though copied *in extenso*.

33.     In the event this Court concludes the Plan is not governed by ERISA, Plaintiffs are entitled to the Plan's benefit entitlements under applicable state law.

**CONSTRUCTION OF PLAN**

34.     Under applicable state law, the Committee was required to interpret the Plan in a manner so as to adopt the most pro-beneficiary interpretation and was required to construe any ambiguity in the Plan in favor of the employee and against the drafter. *Guaranty Nat. Ins. Co. v. Azrock Industries, Inc.,* 211 F. 3d 239, 243 (5th Cir. 2000) (under Texas law, if terms of contract are susceptible of more than one reasonable interpretation, the court, under rule of *contra proferentem,* must resolve uncertainty by adopting construction that most favors the non-drafter); *Meredith v. Louisiana Federation of Teachers,* 209 F.3d 398 (5th Cir. 2000)

13

(same, applying Louisiana law). The Committee, however, rejected that rule of contractual construction and instead adopted a policy of interpreting ambiguous terms in a manner most favorable to the drafter (the Company).

### AMENDMENTS TO PLAN WERE IMPROPER

35.    By its terms, Section 4.5 of the Plan provided that it could not be amended to "reduce benefits or rights to benefits within two (2) years following a Change of Control." Because the amendments improperly terminated Plaintiffs' rights to benefits in contradiction of the plain language of the Plan itself, they are void under applicable state law. *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry.,* 520 U.S. 510, 515, 117 S.Ct. 1513 (1997) (noting that employer may "contractually cede its freedom" to unilaterally terminate employee benefits).

### IMPROPER NOTICE OF AMENDMENTS TO PLAN

36.    If the Plan is not governed by ERISA, the Company did not have a right to withhold notice of its amendments to the plan until the eve of Plaintiffs' termination.  Unlike ERISA, state law does not offer a statutory "safe harbor" period for employers to provide notice of reduction or elimination of severance benefits. Under applicable state law, an employer can not secretly amend a severance plan to terminate benefits and wait nearly a year before disclosing the existence of the amendments to the covered employees on the eve of their termination. Rather, under state law, such conduct constitutes fraudulent concealment, material misrepresentation, or a breach of fiduciary duties.

### MEANING OF THE TERM "BUSINESS SEGMENT"

37.    According to the Committee, Plaintiffs are not entitled to severance benefits because they were terminated "[a]s a result of ... the sale ... by the Company of a ... business

segment."

38.     Although the Committee denied Plaintiffs any severance benefits under the Plan based upon its interpretation of the term "business segment," neither the Plan nor the Committee supplied a definition of that term.  In fact, the Committee refused Plaintiffs' written demand to identify its understanding of the meaning of this critical undefined term. Nevertheless, the Committee concluded the assets sold to EPL constituted a "business segment" because, it said, they were a "well defined and conceptually coherent segment of [the Company's] business ... in multiple fields ... [containing] over 1300 wells ... which operated under its own budget ... with an elaborate staffing system ... generally encompass[ing] a much more specialized work force ... was the only operating segment of the Company subject to comprehensive regulation by both state and federal industry regulatory agencies ... [and] was unique among oil and gas operating segments in general, and among [the "Company's] other segments in particular."

39.     The Committee failed or refused to (i) identify its understanding of the meaning of the term "business segment," (ii) identify any other business segment(s) of the Company and (iii) describe the way in which this or any other business segments of the Company were determined.

40.     Instead of identifying an objective definition (or for that matter any definition) of the term "business segment," the Committee simply identified putative characteristics of the unidentified assets sold to EPL and declared them to constitute a "business segment." Essentially the Committee suggested that it was unable to define the term "business segment" but it "knows-it-when-it-sees-it" and this isn't it.  Such an approach to interpreting critical provisions of the Plan is simply unacceptable.

41.     Because the Plan did not define the term "business segment," the Committee should have interpreted that term in light of its generally accepted meaning if there was one. *See, Wegner v. Standard Ins. Co.,* 129 F.3d 814, 818 (5th Cir. 1997) ("In construing ERISA plan provision, we interpret the contract language 'in an ordinary and popular sense as would a person of average intelligence and experience,' such that the language is given its generally accepted meaning if there is one."); *MetraHealth Ins. Co. v. Drake,* 68 F.Supp.2d 752 (E.D.Tex. 1999) (provisions in ERISA plans must be interpreted as they are likely to be understood by average plan participant); *Jarvis Christian College v. National Union Fire Ins. Co.,* 197 F.3d 742 (5th Cir. 1999) (same, applying Texas law).

42.     Using this standard of construction, the first question the Committee should have resolved is whether there was an objective, widely used and generally accepted meaning of the term "business segment." Plaintiffs were unable to identify (and the Committee refused to supply) a universally accepted definition of the term "business segment." In that regard, Plaintiffs note that the term "business segment" is not defined in Webster's dictionary and is not commonly used in the oil and gas industry. Nevertheless, Plaintiffs identified three (3) definitions of substantially similar terms, *viz.:* (i) Accounting Principles Board ("APB") Opinion No. 30, *Reporting the Results of Operations – Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions,* (defining the term "segment of a business"), (ii) Statement of Financial Accounting Standards ("SFAS") No. 131, *Disclosures of Segments of an Enterprise and Related Information* (defining the reporting requirements for "operating segments"), and (iii) Cost Accounting Standard Board, Office of Federal Procurement Policy, Office of Management and Budget, 48 CFR Chapter 99, 9904.403-30(a)(4) (defining the term

"segment" for purposes of determining allowable allocations of pension costs under government cost reimbursement contracts).

> **(a)   APB Opinion 30 – "Segment of a Business"**

43.    APB Opinion 30 defines the term "segment of a business" to mean "a component of an entity whose activities represent a separate major line of business or class of customer." (paragraph 13) (emphasis supplied).  Clearly, the assets sold to EPL do not fall within the meaning of that definition and none of their putative characteristics identified by the Committee suggest that they do.

44.    Close examination of the Company's prior and current financial statements, annual reports, quarterly reports and SEC filings clearly establish that the Company was engaged in the following "separate major lines of business" in various localities throughout the world, including the Gulf of Mexico region:  (i) exploration, (ii) production, (iii) gathering and transportation, and (iv) marketing.  The assets sold to EPL simply did not constitute one of these "separate major lines of business" as intended by APB Opinion 30.

45.    According to the Company's latest annual and quarterly reports filed with the SEC, it continues to hold large active properties in the Gulf of Mexico region and continues to have a vice president whose primary responsibilities are dedicated to the Gulf of Mexico region.

46.    The instruments conveying the assets to EPL clearly establish that the Company retained some significant assets within the East Bay region which were not sold to EPL.  *See,* "Assignment and Conveyance" by and between Ocean Energy, Inc. and Energy Partners, Ltd. filed of record with the U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region dated March 31, 2000 and approved by MMS on or about May 19,

2000.

47.     The Company's <u>selected</u> assets from the East Bay region which were sold to EPL simply did not constitute a "separate major line of business."

48.     The Company retained assets located within the general locality of East Bay Field and has continued to engage in the same major lines of business in the same general localities as before the sale.

**(b)     SFAS 131 – "Operating Segments"**

49.     In SFAS No. 131, the Financial Accounting Standards Board ruled that all publicly held businesses must <u>separately</u> report in its annual and quarterly reports a measure of profit or loss from "operating segments," including specific revenue and expense items and segment assets.  SFAS No. 131 also requires a company to report descriptive information about the way the operating segments are determined, the products and services rendered by the operating segments, differences between the measurements used in reporting segment information and those used in the company's general purpose financial statements, and changes in the measurement of segment amounts from period to period.

50.     None of the Company's prior annual or quarterly reports or Form 10-Ks or Form 10-Qs filed with the Securities and Exchange Commission identified the assets sold to EPL as an "operating segment."   In fact, the notes to the 1998 and 1999 Consolidated Financial Statements acknowledge the Company's obligation to comply with SFAS 131 but provide: "the Company ... has [only] one reportable segment [as defined by] SFAS 131, and has included geographic information [for that segment] in Notes 15 and 16 to the Consolidated Financial Statements."   The Company did not separately identify the East Bay region or the assets sold to EPL in Notes 15 or 16.

18

51.     In addition to there being no mention of East Bay Field as a separate "business segment" in the Company's published financial statements, there is no evidence in the administrative record to suggest its chief operating decision maker regularly evaluated separate internal financial information (other than a budget) about the field in deciding how to allocate resources and in assessing its performance.

52.     Of course, had the Company's chief operating decision maker regularly reviewed such internal data, SFAS 131 would have required the Company to disclose that financial information in its annual and quarterly reports along with specific revenue and expense information about the putative "segment."

**(c)     Government Cost Accounting Standards, 48 CFR Chapter 99, 9904.403-30(a)(4)**

53.     The Cost Accounting Standards Board ("CASB") of the federal government has defined "segment" for purposes of determining whether pension costs are allowable items of cost under a government cost reimbursement contract as follows:

> *Segment* means one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service.

54.     Although the CASB's standards are not directly applicable to the Company, they are useful to demonstrate there is no uniform definition of the term "business segment." Moreover, even if the CASB's standards were applicable, the assets sold to EPL could not possibly fall within that definition of a "segment" as they did not constitute a "division, product department, plant or subdivision."

55.     There are no documents in the administrative record referring to the assets sold to EPL as a separate "business segment."

56.     The <u>only</u> time these assets have ever been referred to as a separate "business segment" is in the Committee's denial letter to undersigned counsel.

57.     None of the public instruments on file with U.S. Department of the Interior, Minerals Management Services, or in the records of Plaquemines Parish, Louisiana evidencing the conveyance of the subject assets to EPL, referred to them as a "business segment."

58.     Although Plaintiffs have been denied access to certain non-public conveyance instruments (such as the Purchase and Sale Agreement), they suspect the subject assets were never identified as a "business segment." If so, it is simply unfair for the Committee to label the subject assets as a "business segment" for purposes of interpreting the Plan even though they have never been described that way.

59.     That there is simply no generally accepted meaning of the term "business segment" or that its meaning is susceptible to more than one reasonable interpretation is amply demonstrated by the fact that Plaintiffs have provided three (3) distinct interpretations of nearly the identical term used in a substantially similar context as used in the Plan. Thus, as a matter of law, the Committee should have concluded its meaning is vague. Once the Committee makes that determination, however, the rules of construction require that any ambiguity in the Plan "[m]ust be resolved in favor of the employee and made binding against the drafter." *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 982 (5th Cir. 1991). Here, Plaintiffs offered the Committee several rational and reasonable definitions of the term "business segment" which do not conflict with any other provisions of the Plan. Accordingly, under the rules of construction, the Committee should have accepted the interpretation most favorable to Plaintiffs and rejected its own.

## MEANING OF THE TERM "CONTINUED EMPLOYMENT"

60.     The Committee also rejected Plaintiffs' claims for severance benefits because, it said, Plaintiffs were offered "continued employment."   The Committee concluded the "most reasonable construction of ['continued'] is the maintenance of the covered employee's working relationship in East Bay and with the assets in question."

61.     In the context of this Plan, the word "continued" modifies the word "employment," not the *site* of employment (which is not even mentioned in the Plan). According to Webster's dictionary, "continued" means "without interruption."

62.     The question, therefore, is whether Plaintiffs experienced any interruption in their employment.   Beyond doubt, Plaintiffs clearly experienced an interruption in their employment because (i) after Plaintiffs were notified by the Company of their impending involuntary termination, they applied, as individuals, for employment at EPL just as any new applicant would do, (ii) EPL made hiring decisions on an *ad hoc* basis based on its perceived staffing needs and no indication was given that EPL would hire any of the Company's employees, (iii) those workers lucky enough to be hired by EPL were not "retained" or "continued" but were simply hired, just as they might have been hired by any company then accepting applications for employment, (iv) the new jobs offered by EPL had very different wage and benefit compensation structures.  Most significantly, Plaintiffs were not permitted to retain their seniority or to carryover to EPL any of their years of service with the Company.

63.     By any standard, EPL's decision to hire Plaintiffs was not the legal equivalent of "continuing" their employment and can not be considered the same as a "transfer" of their employment.

64.     The Committee's interpretation renders meaningless the word "continued" as it

argues that Plaintiffs were not entitled to severance because they received an offer of employment from EPL. Under the Committee's interpretation, EPL was not required to "continue" Claimants' employment in any respect. The drafters of the Plan could have chosen to adopt that approach or could have chosen to exclude from the Plan's coverage any worker who received an offer of employment from the acquirer of the "business segment" if the offer involved the performance of duties at the same <u>site</u> of employment. Here, however, the drafters did not choose to include either of those matters and it is improper for the Committee to expand the terms of the Plan.

65.     In any event, the Committee's conclusion that its interpretation of the term "continued employment" is "the most reasonable construction" is not only wrong, it also begs the question. The question is whether the Plan is susceptible to more than one reasonable interpretation. If it is and the non-drafter's interpretation of the disputed clause is reasonable, the Committee must accept it and reject the interpretation of the party that drafted the ambiguous provision. *Tapatio Springs Builders, Inc. v. Maryland Cas. Ins. Co.,* 82 F.Supp.2d 633 (W.D. Tex 1999) (applying Texas law).

66.     Beyond doubt, Plaintiffs have offered a reasonable and rational interpretation of the term "continued employment." Indeed, Plaintiffs' interpretation gives the general and accepted meaning of the word "continued" whereas the Committee's interpretation strains credulity at best and at worst renders meaningless the word "continued."

## LOUISIANA WAGE PAYMENT STATUTE

67.     Despite written demand, the Company has refused to comply with the provisions of the Louisiana Wage Payment Act, La. R.S. 23:631 *et seq.*, requiring employers to pay all wages (including any severance benefits) within three days following the date of discharge.

Under Louisiana law, any employer who fails to timely remit severance pay shall be liable for the original severance plus a penalty of the lesser of "[n]inety days' wages at the employee's daily rate of pay, or ... full wages from the time the employee's demand for payment is made until the employer tenders the amount of unpaid wages due to such employee... [plus] reasonable attorneys' fees... " La. R.S. 23:632. *McCarroll v. Central Louisiana Telephone,* 533 So.2d 385 (La. App. 3rd Cir. 1988), *writ denied,* 537 So.2d 1162, *cert. denied,* 491 U.S. 905 (1988) (assessing penalty under La. R.S. 23:632 for failure to pay severance).

68.     Plaintiffs seek full recovery of all wages and penalties due pursuant to the Louisiana Wage Payment Act. Thus, in addition to paying the amount due under the Plan, the Company is liable for the lesser of "[n]inety days' wages at the employee's daily rate of pay, or ... full wages from the time the employee's demand for payment is made until the employer tenders the amount of unpaid wages due to such employee " plus attorneys fees. La. R.S. 23:632

### COUNT 3
### CLAIM FOR BENEFIT ENTITLEMENTS UNDER ERISA

69.     The averments of Paragraphs 1 through 68 above are reiterated by reference and realleged here as though copied *in extenso*.

70.     In the event ERISA governs the Plan (which is denied) and for the reasons asserted in Paragraphs 37-66 above, Plaintiffs seek recovery of all severance benefits due under the Plan pursuant to ERISA.

### COUNT 4
### DENIAL OF FULL AND FAIR REVIEW

71.     The averments of Paragraphs 1 through 70 above are reiterated by reference and realleged here as though copied *in extenso*.

72.     To the extent the Plan is governed by ERISA (which is denied), the Committee violated ERISA by failing to give Plaintiffs a full and fair review of their claim as it did not properly inform Plaintiff of the basis of the denial of their claim.   "Baldface conclusions do not satisfy the requirement" to provide "specific reasons" for the denial of benefits.   *Schadler v. Anthem Life Ins.,* 147 F.3d 388, 398 (5th Cir. 1998).   Yet, in the case at hand, that is precisely what the Committee did as it simply advised Plaintiffs that it based its decision "on [unidentified] information provided by various [unidentified] former East Bay managers as well as on the considerable [unidentified] knowledge of the East Bay segment possessed by the [unidentified] members of the Committee itself."   By separate written requests, Plaintiffs' counsel requested all of the above referenced unidentified information.   The Committee, in turn, refused to provide that information.   By refusing to identify what information (or misinformation) it relied upon to reach its conclusions, the Committee effectively denied Plaintiffs any meaningful access to a full and fair review as Plaintiffs are left to guess what information they need to refute the Committee's erroneous conclusions. Simply stated, the Committee should not be permitted to deny claims based on undisclosed information provided by undisclosed persons.   Likewise, the Committee's failure or refusal to identify its understanding of the meaning of the term "business segment" makes it virtually impossible for Plaintiffs to know what information they need to supply to the Committee to perfect their claim or to demonstrate that the assets in question did not fall within the meaning of the term "business segment."   To suggest that the term "business segment" means any thing the Committee says it means is to have no standard at all.

## COUNT 5
### FAILURE TO DISCLOSE INFORMATION REQUIRED BY ERISA

73.     The averments of Paragraphs 1 through 72 above are reiterated by reference and realleged here as though copied *in extenso*.

74.     To the extent the Plan is governed by ERISA (which is denied), the Company violated ERISA by refusing to disclose to Plaintiffs, despite their written request, the identity of the members of the Committee and other information requested by Plaintiffs.

## COUNT 6
### REQUEST FOR DECLARATORY JUDGMENT
### MANDATORY ARBITRATION CLAUSE IS NOT ENFORCEABLE

75.     The averments of Paragraphs 1 through 74 above are reiterated by reference and realleged here as though copied *in extenso*.

76.     The Plan unlawfully requires Claimants to pay a portion of the arbitration expenses in violation of the Federal Arbitration Act, 9 U.S.C. Section 2. *Shankle v. B-G Maintenance Management of Colorado,* 163 F.3d 1230 (10th Cir. 1999) (mandatory arbitration agreement which required employee to pay portion of arbitrator's fees was unenforceable).

77.     Even if the mandatory arbitration clause were enforceable (which is denied), the sole issue presented to the arbitrator would be whether the Company and Committee properly denied Claimants any benefits due under the Plan.  The arbitrator would not have jurisdiction to determine Claimants' statutory remedies under Louisiana law.  Plaintiff's seek a declaratory judgment declaring the mandatory arbitration clause as invalid.

### COUNT 7 – ATTORNEYS FEES

78.     To enforce the terms of the Plan and collect their entitlement to benefits, Plaintiffs were compelled to retain legal counsel.  If the Plan is an ERISA "plan" (which is

denied), Plaintiffs are entitled to reimbursement of their attorneys' fees. *Wegner v. Standard Ins. Co.,* 129 F.3d 814 (5th Cir. 1997) (awarding attorneys fees for ERISA action under the "lodestar method" and then adjusting upward or downward depending on the circumstances of the case); *Gibbs v. Gibbs,* 210 F.3d 491, 503 (5th Cir. 2000) ("[a] party need not prevail in order to be eligible for an award of attorneys fees under ERISA."). If the Plan is not subject to ERISA, Plaintiffs are entitled to statutory attorneys' fees pursuant to La. R.S. 23:632 for the Company's failure to timely remit severance pay. *McCarroll v. Central Louisiana Telephone,* 533 So.2d 385 (La. App. 3rd Cir. 1988), *writ denied,* 537 So.2d 1162, *cert. denied,* 491 U.S. 905 (1988) (employer's bad faith in amending severance pay policy to ease expense of consolidation warranted award of punitive damages and attorneys fees).

WHEREFORE, Plaintiffs pray for judgment in their favor and against defendant and for all general and equitable relief to which they may be entitled to receive.

Respectfully submitted,

DAVIDSON, NIX & JONES
509 Market St., Suite 800
Shreveport, Louisiana  71101
(318) 424-4342 - Telephone
(318) 226-0168 -  Fax

John S. Hodge, La. Bar No. 18951

ATTORNEYS FOR PLAINTIFFS

# OCEAN ENERGY, INC.

# 1999 CHANGE OF CONTROL
# SEVERANCE PLAN

The **OCEAN ENERGY, INC.** 1999 CHANGE OF CONTROL SEVERANCE PLAN (the **"Plan"**) is hereby adopted pursuant to the authorization of the Board of Directors of **OCEAN ENERGY, INC.** (a Louisiana Corporation) (the **"Company"**). The Plan supercedes and replaces in full any severance plan, practice or policy (written or oral) of the Company existing with respect to Covered Employees prior to the Effective Date.

## L

## DEFINITIONS AND CONSTRUCTION

1.1　**Definitions.** Where the following words and phrases appear in the Plan, they shall have the respective meanings set forth below, unless their context clearly indicates to the contrary.

(a)　**"Board"** shall mean the Board of Directors of the Company.

(b)　**"Change in Duties"** shall mean the occurrence, within two years after the date upon which a Change of Control occurs, of any one or more of the following:

(1)　with respect to a Covered Employee of Severance Level A, a significant reduction in the duties of such Covered Employee from those applicable to him immediately prior to the date on which a Change of Control occurs;

(2)　a reduction in a Covered Employee's annual salary from that provided to him immediately prior to the date on which a Change of Control occurs;

(3)　a change in the location of a Covered Employee's principal place of employment by the Employer by more than 50 miles from the location where he was principally employed immediately prior to the date on which a Change of Control occurs.

(c)　**"Change of Control"** shall mean consummation of the merger contemplated by the Agreement & Plan of Merger between Seagull Energy Corporation and Ocean Energy, Inc. dated as of November 24, 1998.

(d)　**"Code"** shall mean the Internal Revenue Code of 1986, as amended.

(e)　**"Committee"** shall mean the Administration Committee appointed by the Board to administer this Plan.

**EXHIBIT**

1

(f)    **"Company"** shall mean Ocean Energy, Inc. (a Louisiana Corporation).

(g)    **"Compensation"** shall mean the greater of (1) a Covered Employee's annual salary plus his Severance Factor, if any, immediately prior to the date on which a Change of Control occurs or (2) a Covered Employee's annual salary plus his Severance Factor, if any, at the time of his Involuntary Termination. **"Three Months' Compensation"** shall mean Compensation divided by 4.   **"Semi-Monthly Compensation"** shall mean Compensation divided by 24.

(h)    **"Covered Employee"** shall mean any individual who, on the date upon which a Change of Control occurs, is a regular, full-time salaried employee of the Employer or an hourly employee of the Employer who is normally scheduled to work 550 or more hours per year, other than (1) any individual whose terms of employment are governed by a collective bargaining agreement between a collective bargaining unit and the Employer unless such agreement provides for coverage of such individual under the Plan, (2) any individual who is a party to a written agreement with the Employer providing for severance payments or benefits upon such individual's termination of employment with the Employer, (3) an employee who is classified as a temporary, casual, or an independent contractor under the Employer's employment policies, and (4) an employee of a non-U.S. subsidiary unless said employee is a U.S. expatriate or third country national.

(i)    **"Effective Date"** shall mean the date the Board approves the Plan.

(j)    **"Employer"** shall mean the Company and Ocean Energy Resources, Inc. and each eligible organization designated as an Employer in accordance with the provisions of Section 4.4 of the Plan.

(k)    **"ERISA"** shall mean the Employee Retirement Income Security Act of 1974, as amended.

(l)    **"Involuntary Termination"** shall mean any termination of a Covered Employee's employment with the Employer which:

(1)    does not result from a voluntary resignation by the Covered Employee (other than a resignation pursuant to Clause (2) of this Section 1.1(l)); or

(2)    results from a resignation by a Covered Employee on or before the date which is sixty days after the date the Covered Employee receives notice of a Change in Duties;

provided, however, that the term "Involuntary Termination" shall not include a Termination for Cause or any termination as a result of a Covered Employee's death,

disability under circumstances entitling him to benefits under the Employer's long-term disability plan or Retirement.

(m)    "Retirement" shall mean the Covered Employee's voluntary resignation on or after the date he reaches age sixty-five (other than a resignation within sixty days after the date the Covered Employee receives notice of a Change in Duties or a resignation at the request of the Employer).

(n)    "Severance Factor" shall mean the percentage of annual salary for a Covered Employee's Severance Level determined in accordance with the following schedule and expressed as a dollar amount which, when added to the annual salary, results in the Compensation to be used in the severance benefit calculation.

| Severance Level | Severance Factor |
| --- | --- |
| A | 38% |
| B | 30% |
| C | 25% |
| D | 18% |
| E | 0% |

(o)    "Severance Level" shall mean the following category into which a Covered Employee is designated based on his annual salary immediately prior to the date on which a Change of Control occurs or, if greater, at the time of his Involuntary Termination for the purpose of determining his severance benefit amount.

| Severance Level | Annual Salary |
| --- | --- |
| A | $140,000 and above |
| B | $114,900 – $139,999 |
| C | $ 99,600 – $114,899 |
| D | $ 68,000 – $ 99,599 |
| E | Less than   $ 68,000 |

(p)    "Termination for Cause" shall mean any termination of a Covered Employee's employment with the Employer by reason of the Covered Employee's (1) gross negligence in the performance of the Covered Employee's duties and responsibilities, which negligence results in material harm to the business, interests, or reputation of the Employer.

-3-

(2) violation of any material Employer policy, including, without limitation, the theft, embezzlement or misappropriation or material misuse of any Employer funds or property, (3) criminal or civil conviction for a crime involving moral turpitude, (4) willfull and continued failure to perform the Covered Employee's duties and responsibilities, or (5) misconduct that, in the Employer's good faith determination, is materially harmful to the business, interests, or reputation of the Employer.

(q)  **"Welfare Benefit Coverages"** shall mean the medical, dental, life insurance, accidental death and dismemberment, and vision coverages provided by the Employer to its active employees.

1.2  **Number and Gender**. Wherever appropriate herein, word used in the singular shall be considered to include the plural and the plural to include the singular. The masculine gender, where appearing in this Plan, shall be deemed to include the feminine gender.

1.3  **Headings**. The headings of Articles and Sections herein are included solely for convenience and if there is any conflict between such headings and the text of the Plan, the text shall control.

## II.

## SEVERANCE BENEFITS

2.1  **Severance Benefits**. Subject to the provisions of Section 2.2 hereof, if a Covered Employee's employment by the Employer or successor thereto shall be subject to an Involuntary Termination which occurs within two years after the date upon which a Change of Control occurs, then the Covered Employee shall be entitled to the following severance benefits:

(a)  A lump sum cash payment in accordance with the following schedule:

| Severance Level | Benefit Amount |
| --- | --- |
| A | 2 x Compensation |
| B | 1.5 x Compensation |
| C | 1.25 x Compensation |
| D | 1 x Compensation |
| E | Lesser of: |

(1)  the sum of (A) Semi-Monthly Compensation as of his Involuntary Termination for each full year and fraction thereof of continuous employment with the Employer as a

-4-

Covered Employee from his most recent date of hire, and (B) Semi-Monthly Compensation for each full $10,000 increment of such Covered Employee's annual salary at the time of his Involuntary Termination; provided, however, that in no event shall any Covered Employee receive less than Three Months' Compensation; or

     (2)    1 x Compensation.

    (b)    A Covered Employee shall be entitled to continue the Welfare Benefit Coverages for himself and, where applicable, his eligible dependents following his Involuntary Termination for a number of months determined in accordance with the following schedule:

| Severance Level | Number of Months |
|---|---|
| A | 24 |
| B | 18 |
| C | 15 |
| D | 12 |
| E | The number of months for which cash payments are made under Paragraph (a) above (rounded to the nearest whole month if necessary); |

provided however, the Covered Employee must continue either to pay the premiums paid by active employees of the Employer for such coverages or to pay the actual (nonsubsidized) cost of such coverages for which the Employer does not subsidize for active employees. Such benefit rights shall apply only to those Welfare Benefit Coverages which the Employer has in effect from time to time for active employees, and the applicable payments shall adjust as premiums for active employees of the Employer or actual costs, whichever is applicable. change. Welfare Benefit Coverage(s) shall immediately end upon the Covered Employee's obtainment of new employment and eligibility for similar Welfare Benefit Coverage(s) (with the Covered Employee being obligated hereunder to promptly report such eligibility to the Employer). Nothing herein shall be deemed to adversely affect in any way the additional rights, after consideration of this extension period, of Covered Employees and their eligible dependents to health care continuation coverage as required pursuant to Part 6 of Title I of ERISA.

    (c)    A Covered Employee of Severance Level A shall be entitled to receive out-placement services in connection with obtaining new employment up to a maximum cost of $6,000.

(d) The severance benefits payable under this Plan shall be paid to a Covered Employee at the time he receives his final termination pay, or as soon as administratively practicable thereafter, subject to the conditions set forth in Section 2.2 of the Plan. Any severance benefits paid pursuant to this Section will be deemed to be a severance payment and not "Compensation" for purposes of determining benefits under the Employer's qualified plans and shall be subject to any required tax withholding.

2.2 **Release and Full Settlement.** Anything to the contrary herein notwithstanding, as a condition to the receipt of any severance payment hereunder, a Covered Employee whose employment by the Employer has been subject to an Involuntary Termination shall first execute a release, in the form established by the Committee, releasing the Committee, the Employer, and the Employer's shareholders, partners, officers, directors, employees and agents from any and all claims and from any and all causes of action of any kind or character, including but not limited to all claims or causes of action arising out of such Covered Employee's employment with the Employer or the termination of such employment, and the performance of the Employer's obligations hereunder and the receipt of any benefits provided hereunder by such Covered Employee shall constitute full settlement of all such claims and causes of action.

2.3 **Mitigation.** A Covered Employee shall not be required to mitigate the amount of any payment provided for in this Article II by seeking other employment or otherwise, nor shall the amount of any payment provided for in this Article II be reduced by any compensation or benefit earned by the Covered Employee as the result of employment by another employer or by retirement benefits. The benefits under the Plan are in addition to any other benefits to which a Covered Employee is otherwise entitled. Notwithstanding the foregoing, in the event that salary continuation or severance payments are payable by the Employer to a Covered Employee for any reason other than under this Plan ("Other Severance Payments"), including, but not limited to, under any other Employer plan, policy or agreement, other than a "plan" within the meaning of section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, or as a result of the application of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et. seq.* (the "WARN Act"), or an election by the Employer to make payments in lieu of notice as if the WARN Act applied, whether or not it does so apply, to any Involuntary Termination of a Covered Employee, no severance payments shall be payable as provided in Section 2.1(a) to such Covered Employee except to the extent such severance payments exceed the aggregate amount of Other Severance Payments payable to such Covered Employee.

2.4 **Severance Pay Plan Limitation.** This Plan is intended to be an employee welfare benefit plan within the meaning of section 3(1) of ERISA and the Labor Department regulations promulgated thereunder. Therefore, anything to the contrary herein notwithstanding, in no event shall any Covered Employee receive total payments under the Plan that exceed the equivalent of twice such Covered Employee's "annual compensation" (as such term is defined in 29 CFR § 2510.3-2(b)(2)) during the year immediately preceding his Involuntary Termination. If total payments under the Plan to a Covered Employee would otherwise exceed the limitation in the preceding sentence, the amount payable to such Covered Employee pursuant to Section 2.1(a) shall be reduced in order to satisfy such limitation.

2.5    **Certain Additional Payments by the Employer**. Notwithstanding anything to the contrary in the Plan, in the event that any payment or distribution by the Employer to or for the benefit of a Covered Employee, whether paid or payable or distributed or distributable pursuant to the terms of the Plan or otherwise (a "Payment"), would be subject to the excise tax imposed by Section 4999 of the Code or any interest or penalties with respect to such excise tax (such excise tax, together with any such interest or penalties, are hereinafter collectively referred to as the "Excise Tax"), the Employer shall pay to the Covered Employee an additional payment (a "Gross-up Payment") in an amount such that after payment by the Covered Employee of all of taxes (including any interest or penalties imposed with respect to such taxes), including any Excise Tax imposed on any Gross-up Payment, the Covered Employee retains an amount of the Gross-up Payment equal to the Excise Tax imposed upon the Payment. The Employer and the Covered Employee shall make an initial determination as to whether a Gross-up Payment is required and the amount of any such Gross-up Payment. The Covered Employee shall notify the Employer in writing of any claim by the Internal Revenue Service which, if successful, would require the Employer to make a Gross-up Payment (or a Gross-up Payment in excess of that, if any, initially determined by the Employer and the Covered Employee) within ten days of the receipt of such claim. The Employer shall notify the Covered Employee in writing at least ten days prior to the due date of any response required with respect to such claim if it plans to contest the claim. If the Employer decides to contest such claim, the Covered Employee shall cooperate fully with the Employer in such action; provided, however, the Employer shall bear and pay directly or indirectly all costs and expenses (including additional interest and penalties) incurred in connection with such action and shall indemnify and hold the Covered Employee harmless, on an after-tax basis, for any Excise Tax or income tax, including interest and penalties with respect thereto, imposed as a result of the Employer's action. If, as a result of the Employer's action with respect to a claim, the Covered Employee receives a refund of any amount paid by the Employer with respect to such claim, the Covered Employee shall promptly pay such refund to the Employer. If the Employer fails to timely notify the Covered Employee whether it will contest such claim or the Employer determines not to contest such claim, then the Employer shall immediately pay to the Covered Employee the portion of such claim, if any, which it has not previously paid to the Covered Employee.

### III.

### ADMINISTRATION OF PLAN

3.1    **Committee's Powers and Duties**. It shall be a principal duty of the Committee to see that the Plan is carried out, in accordance with its terms, for the exclusive benefit of persons entitled to participate in the Plan. The Committee shall be the named fiduciary and shall have full power to administer the Plan in all of its details, subject to applicable requirements of law. For this purpose, the Committee's powers shall include, but not be limited to, the following authority, in addition to all other powers provided by this Plan:

(a)    to make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan;

(b)     to interpret the Plan, its interpretation thereof to be final and conclusive on all persons claiming benefits under the Plan;

(c)     to decide all questions concerning the Plan and the eligibility of any person to participate in the Plan;

(d)     to make a determination as to the right of any person to a benefit under the Plan (including, without limitation, to determine whether and when there has been a termination of a Covered Employee's employment and the cause of such termination);

(e)     to appoint such agents, counsel, accountants, consultants, claims administrator and other persons as may be required to assist in administering the Plan;

(f)     to allocate and delegate its responsibilities under the Plan and to designate other persons to carry out any of its responsibilities under the Plan, any such allocation, delegation or designation to be in writing;

(g)     to sue or cause suit to be brought in the name of the Plan; and

(h)     to obtain from the Employer and from Covered Employees such information as is necessary for the proper administration of the Plan.

3.2     **Member's Own Participation**.  No Covered Employee or agent of the Committee may act, vote, or otherwise influence a decision of the Committee specifically relating to himself as a participant in the Plan.

3.3     **Indemnification**.  The Company shall indemnify and hold harmless each member of the Committee against any and all expenses and liabilities arising out of his administrative functions or fiduciary responsibilities, including any expenses and liabilities that are caused by or result from an act or omission constituting the negligence of such member in the performance of such functions or responsibilities, but excluding expenses and liabilities that are caused by or result from such member's own gross negligence or willful misconduct.  Expenses against which such member shall be indemnified hereunder shall include, without limitation, the amounts of any settlement or judgment, costs, counsel fees, and related charges reasonably incurred in connection with a claim asserted or a proceeding brought or settlement thereof.

3.4     **Compensation, Bond and Expenses**.  The members of the Committee shall not receive compensation with respect to their services for the Committee.  To the extent required by applicable law, but not otherwise, Committee members shall furnish bond or security for the performance of their duties hereunder.  Any expenses properly incurred by the Committee incident to the administration, termination or protection of the Plan, including the cost of furnishing bond, shall be paid by the Company.

**3.5    Claims Procedure**. Any employee that the Committee determines is entitled to a benefit under the Plan is not required to file a claim for benefits. Any employee who is not paid a benefit and who believes that he is entitled to a benefit or who has been paid a benefit and who believes that he is entitled to a greater benefit may file a claim for benefits under the Plan in writing with the Committee. In any case in which a claim for Plan benefits by a Covered Employee is denied or modified, the Committee shall furnish written notice to the claimant within ninety days (or within 180 days if additional information requested by the Committee necessitates an extension of the ninety-day period), which notice shall:

(a)    state the specific reason or reasons for the denial or modification;

(b)    provide specific reference to pertinent Plan provisions on which the denial or modification is based;

(c)    provide a description of any additional material or information necessary for the Covered Employee or his representative to perfect the claim, and an explanation of why such material or information is necessary; and

(d)    explain the Plan's claim review procedure as contained herein.

In the event a claim for Plan benefits is denied or modified, if the Covered Employee or his representative desires to have such denial or modification reviewed, he must, within sixty days following receipt of the notice of such denial or modification, submit a written request for review by the Committee of its initial decision. In connection with such request, the Covered Employee or his representative may review any pertinent documents upon which such denial or modification was based and may submit issues and comments in writing. Within sixty days following such request for review the Committee shall, after providing a full and fair review, render its final decision in writing to the Covered Employee and his representative, if any, stating specific reasons for such decision and making specific references to pertinent Plan provisions upon which the decision is based. If special circumstances require an extension of such sixty-day period, the Committee's decision shall be rendered as soon as possible, but not later than 120 days after receipt of the request for review. If an extension of time for review is required, written notice of the extension shall be furnished to the Covered Employee and his representative, if any, prior to the commencement of the extension period.

**3.6    Mandatory Arbitration**. If a Covered Employee or his representative is not satisfied with the decision of the Committee pursuant to the Plan's claims review procedure, such Covered Employee or his representative may, within sixty days of receipt of the written decision of the Committee, request by written notice to the Committee, that his claim be submitted to arbitration pursuant to the employee benefit plan claims arbitration rules of the American Arbitration Association. Such arbitration shall be the sole and exclusive procedure available to a Covered Employee or his representative for review of a decision of the Committee. In reviewing the decision of the Committee, the arbitrator shall use the standard of review which would be used by a Federal court in reviewing such decision under the provisions of ERISA. The Covered Employee or his

-9-

representative and the Plan shall share equally the cost of such arbitration. The arbitrator's decision shall be final and legally binding on both parties. This Section shall be governed by the provisions of the Federal Arbitration Act.

# IV.

## GENERAL PROVISIONS

**4.1** **Funding**. The benefits provided herein shall be unfunded and shall be provided from the Employer's general assets.

**4.2** **Cost of Plan**. The entire cost of the Plan shall be borne by the Employer and no contributions shall be required of the Covered Employees.

**4.3** **Plan Year**. The Plan shall operate on a plan year consisting of the twelve consecutive month period commencing on January 1 of each year with a short plan year commencing on the Effective Date and ending on December 31, 1999.

**4.4** **Other Participating Employers**. The Committee may designate any entity or organization eligible by law to participate in this Plan as an Employer by written instrument delivered to the Secretary of the Company and the designated Employer. Such written instrument shall specify the effective date of such designated participation, may incorporate specific provisions relating to the operation of the Plan which apply to the designated Employer only and shall become, as to such designated Employer and its employees, a part of the Plan. Each designated Employer shall be conclusively presumed to have consented to its designation and to have agreed to be bound by the terms of the Plan and any and all amendments thereto upon its submission of information to the Committee required by the terms of or with respect to the Plan; provided, however, that the terms of the Plan may be modified so as to increase the obligations of an Employer only with the consent of such Employer, which consent shall be conclusively presumed to have been given by such Employer upon its submission of any information to the Committee required by the terms of or with respect to the Plan. Except as modified by the Committee in its written instrument, the provisions of this Plan shall be applicable with respect to each Employer separately, and amounts payable hereunder shall be paid by the Employer which employs the particular Covered Employee.

**4.5** **Amendment and Termination**. The Plan may be amended from time to time at the discretion of the Board. Notwithstanding the foregoing, this Plan may not be amended to reduce benefits or rights to benefits within two years following a Change of Control. For purposes of this Section, a change in the designation by the Committee of Participating Employers pursuant to Section 4.4 shall be deemed to be an amendment to the Plan. The Plan shall terminate two years after the date of the Change in Control except with respect to severance benefits payable as a result of Involuntary Terminations occurring prior to such date.

**4.6** **Not Contract of Employment**. The adoption and maintenance of the Plan shall not be deemed to be a contract of employment between the Employer and any person or to be

consideration for the employment of any person. Nothing herein contained shall be deemed to give any person the right to be retained in the employ of the Employer or to restrict the right of the Employer to discharge any person at any time nor shall the Plan be deemed to give the Employer the right to require any person to remain in the employ of the Employer or to restrict any person's right to terminate his employment at any time.

4.7  **Severability**. Any provision in the Plan that is prohibited or unenforceable in any jurisdiction by reason of applicable law shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating or affecting the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

4.8  **Nonalienation**. Covered Employees shall not have any right to pledge, hypothecate, anticipate or assign benefits or rights under the Plan, except by will or the laws of descent and distribution.

4.9  **Effect of Plan**. This Plan is intended to supersede all prior oral or written policies of the Employer and all prior oral or written communications to Covered Employees with respect to the subject matter hereof, and all such prior policies or communications are hereby null and void and of no further force and effect. Further, this Plan shall be binding upon the Employer and any successor of the Employer, by merger or otherwise, and shall inure to the benefit of and be enforceable by the Employer's Covered Employees.

4.10  **Governing Law**. The Plan shall be interpreted and construed in accordance with the laws of the State of Texas, except to the extent preempted by federal law.

EXECUTED this 8th day of February, 1999.

OCEAN ENERGY, INC.

By:  _____

Name:  Robert K. Reeves
Title:   Executive Vice President, General
         Counsel & Secretary

-11-

# FIRST AMENDMENT TO
# OCEAN ENERGY, INC.
## 1999 CHANGE OF CONTROL SEVERANCE PLAN

WHEREAS, OCEAN ENERGY, INC., a Louisiana corporation (the *"Company"*) has heretofore adopted and currently maintains the OCEAN ENERGY, INC. 1999 CHANGE OF CONTROL SEVERANCE PLAN (the *"Plan"*); and

WHEREAS, the Company desires to amend the Plan in certain respects;

NOW, THEREFORE, the Plan is hereby amended as follows, effective as of March 29, 1999:

1.    Section 1.1(l) of the Plan shall be deleted and the following shall be substituted therefor:

"(l)    'Involuntary Termination' shall mean any termination of a Covered Employee's employment with the Employer which:

(1)    does not result from a voluntary resignation by the Covered Employee (other than a resignation pursuant to Clause (2) of this Section 1.1(l)); or

(2)    results from a resignation by a Covered Employee on or before the date which is sixty days after the date the Covered Employee receives notice of a Change in Duties;

provided, however, that the term 'Involuntary Termination' shall not include a Termination for Cause, a termination of a Covered Employee's employment occurring as a result of or in connection with the sale or other divestiture by the Employer of a division, subsidiary, or other business segment (including, without limitation, a divestiture by sale of shares of stock or of assets) if such Covered Employee is offered continued employment by the acquiror of such business segment immediately upon such sale or divestiture, or any termination as a result of a Covered Employee's death, disability under circumstances entitling him to benefits under the Employer's long-term disability plan or Retirement."

2.    As amended hereby, the Plan is specifically ratified and reaffirmed.

EXECUTED this ___ day of March, 1999.

OCEAN ENERGY, INC.

By: _____

Name: Robert K. Reeves

Title: Exec. V.P. & General Counsel

VEHOU02:135997.1

-2-